**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**COURTNEY MASON**                                                          **PLAINTIFF**

**v.**                          **Case No. 2:22-CV-00151-LPR**

**DAVID CARRUTH, individually and in**
**his official capacity**                                                    **DEFENDANT**

<u>**ORDER**</u>

     This case presents allegations of a public servant abusing the powers of his office for sexual gratification.  At all times relevant to this lawsuit, Defendant David Carruth was a Monroe County District Judge and then the Clarendon City Attorney.  Plaintiff Courtney Mason's boyfriend was a criminal defendant in a case before then-Judge Carruth.  Ms. Mason alleges that (in essence) Mr. Carruth made her choose between having sex with him or having her boyfriend risk a parole violation.  Additionally, according to the operative Complaint, after Ms. Mason rejected Mr. Carruth's solicitation efforts and reported him to law enforcement, Mr. Carruth began a campaign to discredit Ms. Mason and seek retribution against her.  Ms. Mason alleges that Mr. Carruth's actions violated her rights under the United States Constitution, the Arkansas Constitution, Arkansas's statutes, and Arkansas's common law.

     If the allegations in the operative Complaint are true—or even in the neighborhood of true—Mr. Carruth has brought shame to the judiciary and should be held accountable.  Having said that, the operative Complaint does not state any viable federal claims.  And without viable federal claims to support federal jurisdiction, the state law claims in this case are most appropriately litigated in state court.  Accordingly, all claims in this case are DISMISSED without prejudice.  The dismissals of the federal claims are "on the merits."  But the dismissals of the state law claims are not—Ms. Mason is free to pursue those claims in state court.

## BACKGROUND

As required by Supreme Court precedent, the facts in this Background Section are drawn from Ms. Mason's Amended Complaint and assumed to be true at this stage of the litigation.[1] Obviously, if this case proceeded past this stage, Ms. Mason would have to actually prove her allegations.

Mr. Carruth was elected as a Monroe County District Judge in 2012.[2]  In that role, he "presided over cases involving traffic violations, misdemeanor offenses, preliminary felony matters, and civil matters where the amount in controversy did not exceed $5,000.00."[3]  The District Judge job was only part-time; Mr. Carruth also maintained a private law practice.[4]  Over the years, Mr. Carruth represented both Ms. Mason and Ms. Mason's ex-husband in legal proceedings.[5]  In fact, the instant case begins with a meeting between Ms. Mason and Mr. Carruth in Mr. Carruth's law office about one of those proceedings.

On April 14, 2022, Ms. Mason visited Mr. Carruth "about outstanding paperwork related to the legal proceeding in which [Mr. Carruth] represented [Ms. Mason's] ex-husband."[6]  At the time, Mr. Carruth was also the presiding judge in a criminal case in which Ms. Mason's boyfriend was a defendant.  During the April 14 meeting, Ms. Mason "asked [Mr. Carruth] if he could help with her boyfriend's pending criminal case."[7]  Mr. Carruth explained that a judge helping out a criminal defendant is very risky for that judge, so Mr. Carruth would need something "of equal or

---

[1] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

[2] Am. Compl. (Doc. 10) ¶ 4.

[3] *Id.*

[4] *Id.*

[5] *Id.* ¶ 6.

[6] *Id.* ¶ 7.

[7] *Id.*

greater value to the risk he would be taking . . . ."[8] Ms. Mason "offered to admit to potential crimes she had committed . . . ."[9] Mr. Carruth initially seemed to consider that an acceptable exchange.

Ms. Mason returned to Mr. Carruth's office on April 18, 2022, "with a handwritten list of potential crimes she had committed."[10] Mr. Carruth told Ms. Mason that he was going to turn the list into an affidavit for Ms. Mason to sign and notarize; Mr. Carruth would then keep the affidavit in a safe at his home.[11] Mr. Carruth also informed Ms. Mason that "he could set her boyfriend's trial . . . as quickly as possible, which would enable the charge to be dismissed" before her boyfriend's upcoming parole-violation hearing.[12] (The parole-violation hearing was apparently in a different court in front of a different judge.)

It gets worse. Mr. Carruth suggested to Ms. Mason in the April 18, 2022 meeting that his plans to help Ms. Mason and her boyfriend were tentative and conditional: "I haven't made up my mind to do anything yet. I got one area I want to explore with you. And I don't know how you're gonna react. Um. [H]ow do you feel about sex?"[13] Ms. Mason explained to Mr. Carruth that she would "prefer not to have to in order to get this done," and she ultimately "refused the request" to have sex with Mr. Carruth.[14] Mr. Carruth then asked whether Ms. Mason had "any nice lingerie,"

---

[8] *Id.* ¶ 8.

[9] *Id.*

[10] *Id.* ¶ 11.

[11] *Id.*

[12] *Id.* ¶ 12 (internal quotation marks omitted).

[13] *Id.* ¶ 13 (cleaned up).

[14] *Id.* (brackets omitted).

and, when Ms. Mason said that she did, Mr. Carruth asked to see Ms. Mason wearing it.[15]  Ms. Mason again refused Mr. Carruth's request.[16]

After Ms. Mason rejected both of Mr. Carruth's advances, he pivoted and began to explain the standard timelines for a criminal trial such as the one Ms. Mason's boyfriend was facing.[17]  He stated that Ms. Mason would be "buying" the opportunity "to try to shorten those timeframes . . . ."[18]  Despite Ms. Mason rejecting his requests, Mr. Carruth ended the April 18, 2022 meeting by telling Ms. Mason that he would "check with his court clerk to see if" Ms. Mason's boyfriend's case could be sped up.[19]  One week later, on April 25, 2022, Ms. Mason revealed to Mr. Carruth that she had used her phone to record the April 18 meeting.[20]  The next day, April 26, 2022, Ms. Mason reported Mr. Carruth "to law enforcement for soliciting sex from her in exchange for helping with her boyfriend's case."[21]

Mr. Carruth then went on the war path.  On two separate days—April 28, 2022, and May 2, 2022—he met with agents of the Arkansas State Police in an effort to undermine Ms. Mason's narrative.[22]  The FBI was part of the second meeting.[23]  In those meetings, Mr. Carruth told the law enforcement officers about the list of crimes that Ms. Mason may have committed.[24]  He said

---

[15] *Id.*

[16] *Id.*  Apparently, this was not Mr. Carruth's first time trying to exchange judicial favors for sex.  In November of 2018, the Judicial Discipline and Disability Commission issued an "admonishment . . . after an inquiry into allegations that he had solicited sexual favors from women appearing before him as a judge."  *Id.* ¶ 9.

[17] *Id.* ¶ 14.

[18] *Id.*

[19] *Id.* ¶ 15; *see also id.* ¶ 20 ("On or about April 29, 2022, [Ms. Mason's] boyfriend's arraignment date was moved from June 16, 2022, to May 5, 2022.").

[20] *Id.* ¶ 16.

[21] *Id.* ¶ 17.

[22] *Id.* ¶¶ 18–22.

[23] *Id.* ¶ 22.

[24] *Id.* ¶¶ 18, 22.

that Ms. Mason was the one to initiate the conversations about helping her boyfriend and about

her trading sex for help; Mr. Carruth also said he immediately put a stop to those conversations.[25]

He showed the officers text messages he sent to Ms. Mason that read, "Yes, I will do the right

thing.  And everyone will lose."[26]  Mr. Carruth told the agents that these messages came in the

context of a conversation in which Ms. Mason asked Mr. Carruth to dismiss her boyfriend's case

and Mr. Carruth refused.[27]  Essentially, the story Mr. Carruth pitched to law enforcement was that

Ms. Mason was trying to blackmail him by "conjuring up a false story about him of a sexual nature

to report to either the Arkansas State Police or the Judicial Discipline and Disability

Commission."[28]  It appears that Ms. Mason's and Mr. Carruth's discussions with law enforcement

eventually led to a federal indictment being brought against Mr. Carruth.[29]

Sometime in 2022—after the foregoing conversations with law enforcement took place but

before the filing of the operative Complaint in this lawsuit and the federal indictment against Mr.

Carruth—Mr. Carruth was elected as City Attorney for Clarendon, Arkansas.[30]  "Shortly after he

took office," Mr. Carruth allegedly caused Ms. Mason "to be investigated by the Clarendon City

police by falsely accusing [her] of stealing a go cart."[31]  Ms. Mason alleges that Mr. Carruth

instigated this go-cart investigation as a means of intimidating Ms. Mason so that she would neither

file the instant lawsuit nor testify at the Grand Jury sitting that led to Mr. Carruth's federal

---

[25] *Id.* ¶¶ 19, 24.

[26] *Id.* ¶ 23.

[27] *Id.*

[28] *Id.* ¶ 18 (cleaned up).

[29] *See id.* ¶¶ 35, 52.

[30] *See id.* ¶¶ 51–52.

[31] *Id.* ¶ 52.

indictment.[32]  As far as the Court can tell, Ms. Mason suffered no legal consequences as a result of this investigation.[33]

## DISCUSSION

Ms. Mason brings numerous causes of action under federal and state law.  The Court begins (and ultimately ends) with Ms. Mason's federal claims.  Those claims, brought pursuant to 42 U.S.C. § 1983, arise under the First and Fourteenth Amendments to the United States Constitution. Ms. Mason says that Mr. Carruth's statements to law enforcement officers and his instigation of the go-cart investigation were acts of retaliation for Ms. Mason's First Amendment-protected speech activities—that is, her reporting Mr. Carruth's solicitation, her plans to bring the instant suit, and her plans to testify at the Grand Jury sitting.  She also contends that Mr. Carruth violated the Fourteenth Amendment's Equal Protection Clause and the doctrine of substantive due process when he pressured her to perform sexual favors.

All of Ms. Mason's federal claims share one precondition: Ms. Mason must plausibly allege that, when Mr. Carruth engaged in the allegedly unlawful conduct, he was acting as a Judge or City Attorney, as the case may be.  That is because "§ 1983 excludes from its reach merely private conduct . . . ."[34]  The official-action element knocks out any and all claims based on Mr. Carruth's statements to the State Police and FBI.  In those activities, Mr. Carruth was not exercising any type of government power.  Instead, he was conversing with law enforcement as a private citizen seeking to avoid criminal prosecution.  While the statements he made in those conversations may well be the basis of a state law tort—such as intentional infliction of emotional

---

[32] *Id.*

[33] *See id.* ¶ 53.

[34] *Campbell v. Reisch*, 986 F.3d 822, 824 (8th Cir. 2021) (citation omitted).

distress or defamation—they cannot lay the foundation for a § 1983 lawsuit alleging federal constitutional violations.[35]

The official-action element is not dispositive of all the federal claims. Specifically, with respect to Ms. Mason's federal claims based on Mr. Carruth's attempts to solicit sex, the official-action element appears to be satisfied. It could certainly be said that Mr. Carruth was acting in his judicial role when offering to speed up Ms. Mason's boyfriend's case in exchange for sexual favors from Ms. Mason—after all, Mr. Carruth was offering to exercise his judicial power over the case docket.[36] But there's still a major problem for Ms. Mason. She hasn't plausibly alleged a constitutional violation.

For example, Ms. Mason claims that Mr. Carruth deprived her of bodily integrity, which could be a violation of the Fourteenth Amendment under the doctrine of substantive due process.[37] But there is no allegation that Mr. Carruth ever actually touched Ms. Mason, much less engaged in the type of sexual assault that would raise constitutional concerns.[38] Ms. Mason also contends that Mr. Carruth violated the Fourteenth Amendment's Equal Protection Clause because, "[h]ad [she] not been a woman, [Mr. Carruth] would not have offered her leniency for her boyfriend in

---

[35] *See* Am. Compl. (Doc. 10) ¶¶ 32, 35, 39–40.

[36] Mr. Carruth argues that he is entitled to judicial immunity on these claims. Because Mr. Carruth's invocation of the judicial immunity doctrine does not implicate this Court's subject-matter jurisdiction, and because dismissal of these claims is warranted for other reasons, this Court does not decide whether Mr. Carruth is immune from this suit. *See Boyd v. Carroll*, 624 F.2d 730, 732–33 (5th Cir. 1980) (noting that judicial immunity is an affirmative defense); *Kelsey v. Withers*, 718 F. App'x 817, 821–22 (11th Cir. 2017) (stating that "judicial immunity can be waived entirely").

[37] *See Rogers v. City of Little Rock*, 152 F.3d 790, 795–97 (8th Cir. 1998).

[38] *See, e.g., id.* at 793–94 (police officer coerced the plaintiff into sexual intercourse); *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 970 (8th Cir. 2014) (state rehab center employee forcibly raped a patient); *Johnson v. Phillips*, 664 F.3d 232, 239 (8th Cir. 2011) (city police officer took pictures of, and digitally penetrated, the plaintiff's vagina); *see also Schmidt v. City of Bella Villa*, 557 F.3d 564, 574 (8th Cir. 2009) (finding "no constitutional violation" when "[t]here [was] absolutely no allegation that defendant . . . touched plaintiff, performed any type of sexual act upon plaintiff, or physically invaded plaintiff's bodily integrity in any manner").

exchange for sex."[39]  But in this day and age, the allegation that Mr. Carruth would not have made the same offer to a man is conclusory and speculative.  Ms. Mason doesn't allege that Mr. Carruth is exclusively heterosexual, and it would be inappropriate for the Court to just assume it without any allegation.[40]  In any event, Ms. Mason doesn't allege any cognizable injury associated with the alleged Equal Protection violation.  No monetary injury.  No tangible consequences to her or her boyfriend.  What she does allege—being really upset with and mad at Mr. Carruth's proposition—is not the type of injury that has ever been recognized to give rise to an Equal Protection claim.[41]

The last federal claim to address is Ms. Mason's claim that Mr. Carruth unlawfully caused an investigation to be launched into Ms. Mason for possibly stealing a go-cart.  This claim satisfies the official-action element because Mr. Carruth performed this act in his role as Clarendon City Attorney.  But, like the sex-offer claims, it has other problems.

In short, Ms. Mason hasn't pled sufficient facts to maintain a First Amendment retaliation claim based on the go-cart investigation.  Ms. Mason must allege facts that, if eventually proven true, will establish a legal violation.  First Amendment retaliation claims require a plaintiff to eventually show that the defendant's retaliatory motive caused the defendant to take the adverse

---

[39] Am. Compl. (Doc. 10) ¶ 45.

[40] The fact that Mr. Carruth has offered other women favorable judicial treatment in exchange for sex, *see id.* ¶ 9, doesn't make Ms. Mason's allegation any less speculative.

[41] *See Brown v. Nutsch*, 619 F.2d 758, 764 n.9 (8th Cir. 1980) ("Damages resulting from mental and emotional distress are recoverable to the extent actual injury was caused by the [§] 1983 violation."); *Bolden v. Se. Penn. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994) ("A plaintiff in a section 1983 case cannot recover for emotional distress unless he or she presents evidence of 'actual injury.'" (quoting *Carey v. Piphus*, 435 U.S. 247 (1978))); *Smith v. Frye*, 488 F.3d 263, 272–74 (4th Cir. 2007) (plaintiff who alleged "suffer[ing] the injuries of indignity, embarrassment, and emotional distress" did not state a sufficient injury for a § 1983 claim).  The Supreme Court has relaxed this standard in one specific form of Equal Protection claim: When a plaintiff was prevented from even being considered for a government benefit, the refusal to be considered is itself the injury.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." (quotation marks and citation omitted)).  This is not one of those cases.

action.[42]  When the adverse action comes in the context of criminal law enforcement, there's really only two ways a plaintiff can satisfy the causation element.[43]  Option one is to show that the defendant did not have probable cause (or whatever the constitutionally necessary degree of suspicion may be, given the circumstances) to take the action in the first place.[44]  The logic here is that if (1) probable cause (or whatever the constitutionally necessary degree of suspicion may be, given the circumstances) didn't exist at the time of the adverse action, then (2) another person in defendant's shoes wouldn't have done what defendant did, and so (3) the defendant's retaliatory motive is really the only thing left to explain the defendant's conduct.[45]  Option two is to show that even if probable cause (or whatever the constitutionally necessary degree of suspicion may be, given the circumstances) existed, "otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" subject to the same sort of adverse action as the plaintiff.[46]  Call this the jaywalking theory:

> [A]t many intersections, jaywalking is endemic but rarely results in arrest.  If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury . . . .[47]

Ms. Mason's operative Complaint is insufficient to plausibly allege either option.  The operative Complaint alleges only that the investigation was kicked off by Mr. Carruth "falsely

---

[42] *Laney v. City of St. Louis*, 56 F.4th 1153, 1157 & n.2 (8th Cir. 2023).

[43] *See Nieves v. Bartlett*, 139 S.Ct. 1715, 1723 (2019) (noting that it is the plaintiff's burden to "plead and prove" the link between the defendant's retaliatory animus and the adverse action (citing *Hartman v. Moore*, 547 U.S. 250, 263, 265–66 (2006))).

[44] *See id.* at 1721–27.

[45] *See id.* at 1723.

[46] *Id.* at 1727.

[47] *Id.*

accusing" Ms. Mason.[48]  But an accusation can be "false"—i.e., ultimately proven inaccurate—and still be based on a constitutionally reasonable degree of suspicion of wrongdoing.[49]  Nothing in the operative Complaint says either way whether there was any evidence that allowed for a reasonable person to suspect Ms. Mason of stealing the go-cart.  Nor does the operative Complaint plausibly allege a claim pursuant to the jaywalking theory.  There's nothing to suggest that Mr. Carruth would refrain from launching a similar investigation into someone suspected of a similar theft.  Without more, it isn't plausible to conclude that Mr. Carruth's animus toward Ms. Mason is what caused the investigation.

Causation isn't Ms. Mason's only problem, either.  It's far from clear whether she alleged an injury sufficient to state a First Amendment retaliation claim.  A defendant's adverse action must be one "that would chill a person of ordinary firmness from continuing in the" First Amendment-protected activity.[50]  Typically, First Amendment retaliation claims are premised on an allegedly unlawful search, seizure, use of force, or perhaps an adverse employment consequence.[51]  Ms. Mason alleges none of these things.  She doesn't say her home was searched or that she was detained, charged with a crime, or otherwise seized.  She doesn't even say that the investigation caused her some form of reputational harm.  Ms. Mason's theory seems to be that

---

[48] Am. Compl. (Doc. 10) ¶ 52.

[49] *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) ("The determination of whether probable cause, or reasonable suspicion, existed is not to be made with the vision of hindsight, but instead by looking to what the [defendant] reasonably knew at the time." (internal quotation marks and citation omitted)); *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) ("Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." (cleaned up)).

[50] *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).

[51] *See, e.g.*, *Nieves*, 139 S.Ct. 1715 (retaliatory arrest); *Hartman*, 547 U.S. 250 (retaliatory inducement of prosecution); *Laney*, 56 F.4th at 1157 (use of pepper spray); *Meyers v. Sarke*, 420 F.3d 738, 744 (8th Cir. 2005) (adverse employment consequences).

the investigation itself is a sufficiently adverse action.  But the Court is unaware of any case supporting such a theory,[52] and Ms. Mason hasn't provided one.[53]

**CONCLUSION**

Based on the foregoing analysis, none of Ms. Mason's federal law claims survives.  All of those claims will be dismissed.  When a federal court "has dismissed all claims over which it has original jurisdiction," the court "may decline to exercise supplemental jurisdiction over" the remaining state law claims.[54]  This Court declines to exercise supplemental jurisdiction over Ms. Mason's state law claims.

Ms. Mason's federal claims are DISMISSED without prejudice for failure to state a claim upon which relief could be granted.  Ms. Mason's state law claims are DISMISSED without prejudice because the Court declines to exercise supplemental jurisdiction over Ms. Mason's state law claims.  To be clear, the dismissals of the federal claims are "on the merits," while the dismissals of the state law claims are not.  The dismissals of the state law claims are simply so that those claims may be brought in state court—where they belong.

---

[52] Indeed, in the public-employment context at least, it is well-established in the Eighth Circuit that an investigation is not itself an adverse action sufficient to support a First Amendment retaliation claim.  *See, e.g.*, *Altonen v. City of Minneapolis*, 487 F.3d 554, 559–60 (8th Cir. 2007).

[53] The uncertainty as to whether an investigation is itself a sufficiently adverse action is relevant to yet another problem for Ms. Mason—immunity doctrines.  One of two types of immunity would ultimately be at play here: absolute prosecutorial immunity or the qualified immunity afforded to law enforcement officers who investigate crimes.  *See Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) (prosecutors enjoy "absolute immunity under" § 1983 for prosecutorial conduct); *Buckley v. Fitzsimmons*, 509 U.S. 259, 274–76 (1993) (prosecutors entitled to qualified immunity for investigative actions).  Even if the less defendant-friendly qualified immunity applied, Ms. Mason's claim would fail because it is not clearly established that launching an investigation is in and of itself the type of conduct that opens a public official to personal liability for monetary damages.  *See Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017) (qualified immunity is meant to give public officials the ability to "anticipate when their conduct may give rise to liability for damages" (citation omitted)).

[54] 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED this 30th day of June 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE